# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **MANFORD THOMPSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-16-1257-R** |
| | ) | |
| **(1) APS OF OKLAHOMA, LLC d/b/a** | ) | |
| **FORT THUNDER HARLEY** | ) | |
| **DAVIDSON,** | ) | |
| **(2) HARLEY-DAVIDSON MOTOR** | ) | |
| **COMPANY, INC., and** | ) | |
| **(3) HARLEY-DAVIDSON MOTOR** | ) | |
| **COMPANY GROUP, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Before this Court are Defendant Harley-Davidson Motor Company Group, LLC's

Motion to Exclude Plaintiff's Expert, Mark Ezra, Doc. 55, and Motion for Summary

Judgment, Doc. 56. Plaintiff has responded to both motions, *see* Docs. 59–60, and the

matter is fully briefed and at issue.[1] For the reasons stated herein, the Court DENIES

Defendant's Motions.

---

[1] On September 14, 2018, this Court heard oral argument regarding Defendant's Motion to Exclude Plaintiff's Expert, Mark Ezra. *See* Doc. 62. Neither party requested a formal, *Daubert* hearing, and the Court finds such a hearing unnecessary based on the record evidence. Courts have considerable latitude in deciding whether to conduct such hearings. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Goebel v. Denver and Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000) ("*Goebel I*") (noting that a *Daubert* hearing is "not specifically mandated").

On September 27, 2014, Plaintiff Manford Thompson was driving his 2014 Harley-Davidson SuperGlide Custom (FXDC103) (hereinafter "Motorcycle") at approximately 35 to 40 miles per hour on State Highway 59 North in Crawford County, Arkansas;[2] he had purchased the Motorcycle from Fort Thunder Harley Davidson, a defendant to this action.[3] *See* Docs. 1-1, at 2–4; 55-2, at 5; 59-1, at 3.[4] Mr. Thompson alleges that, while he was preparing to enter a sweeping, right-hand turn, the Motorcycle (and, specifically, the handlebars) started "shaking violently,"[5] causing him to "lo[se] all [his] ability to steer." Doc. 55-2, at 6–8.[6] The right side of the Motorcycle subsequently impacted a concrete bridge abutment. Doc. 59-1, at 3. Mr. Thompson was thrown from the Motorcycle and sustained injuries, including an amputated leg. *Id*.; *see* Doc. 1-1, at 4. Mr. Thompson asserts that his hands remained on the handlebars throughout the shaking. Doc. 59-2, at 3.

Two eyewitnesses to the accident—Brandon Hubbard and Daniella Devrow—were interviewed and deposed. *See* Docs. 55-4, 55-5, 59-4. Mr. Hubbard testified in his deposition that Mr. Thompson was riding near the middle of his lane at around 40 to 45 miles per hour when the shaking began. Doc. 55-4, at 7–8. Mr. Hubbard described the

---

[2] Mr. Thompson testified in deposition that, at the time of the incident, the Motorcycle had approximately 700 miles on it and no history of handling problems. *See* Doc. 55-2, at 3.

[3] Fort Thunder is captioned as "APS of Oklahoma, LLC, d/b/a Fort Thunder Harley Davidson" on all pleadings and motions.

[4] In citing the briefs, the Court uses the Electronic Case Filing (ECF) page numbers for exhibits (exhibits indicated by, *e.g.*, "Doc. 55-1") and the original page numbers for the briefs themselves (briefs indicated by, *e.g.*, "Doc. 55").

[5] Mr. Thompson testified in his deposition that he was "on the outside of [his] lane" when the shaking began. Doc. 55-2, at 7.

[6] Mr. Thompson testified that he checked the Motorcycle's engine instrument cluster when the shaking began, but saw nothing that indicated a problem to him. *See* Doc. 55-2, at 7.

Motorcycle's movements as "a mix between a shake and a wobble," with the Motorcycle "swaying substantially" and its back end sliding to the right. *See id.* at 6–7. Ms. Devrow likewise saw the rear of the Motorcycle shaking, though she additionally testified in her deposition that she could see the Motorcycle's handlebars, that the front was not shaking, and that only the rear of the Motorcycle shook. *See* Doc. 55-5, at 3.[7]

Mr. Thompson filed this diversity suit alleging products liability and negligence claims.[8] In support of his suit, Mr. Thompson marshaled Mark A.M. Ezra, P.E.—the subject of Defendant's instant Motion to Exclude—as an expert. Mr. Ezra's investigation

---

[7] Mr. Hubbard's deposition testimony is inconsistent regarding whether he could see the front portion of the Motorcycle. On page 14 of his deposition, Mr. Hubbard testifies that he could see only the rear of the Motorcycle. Doc. 59-4, at 3. But on page 24, Mr. Hubbard asserts that he could see the front end and it was not shaking. Doc. 55-4, at 10. Mr. Hubbard testified that he was about 30 yards behind Mr. Thompson when the shaking began. *See id.* at 7.

[8] First, the Court agrees with Defendant that Plaintiff does not clearly indicate whether he is bringing a negligence claim, a products liability claim, or both. *See* Def.'s Mot. Summ. J., Doc. 56, at 1 n. 1. Accordingly, this Court assumes Plaintiff brings his suit under both theories. Second, Plaintiff does not indicate which law he believes applies to this dispute, and Defendant assumes Oklahoma law applies. *See id.* at 10 n. 4. "In a diversity action, we apply the substantive law of the forum state, including its choice of law rules." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 495–97 (1941)). In the Tenth Circuit, courts typically do not raise choice of law issues *sua sponte* where the parties have acquiesced to the application of a particular state's laws. *See Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 831 n. 4 (10th Cir. 2005); *see also In re Korean Air Lines Disaster*, 932 F.2d 1475, 1495 (D.C. Cir. 1991) ("Unlike jurisdictional issues, courts need not address choice of law questions *sua sponte*."). In light of the parties' acquiescence and the absence of any constitutional limitations, *see Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312–13 (1981), this Court applies Oklahoma law to the dispute. Under Oklahoma law, the elements of negligence are: (1) Defendant owed a duty to Plaintiff; (2) Defendant breached that duty; and (3) the breach caused Plaintiff's injuries. *See Smith v. City of Stillwater*, 2014 OK 42, ¶ 22, 328 P.3d 1192, 1200. Under Oklahoma law, the elements of manufacturers' products liability are: (1) the product caused Plaintiff's injuries; (2) the product defect existed when it left Defendant's possession and control; and (3) the defect made the product "unreasonably dangerous." *Kirkland v. Gen. Motors Corp.*, 521 P.2d 1353, 1363 (Okla. 1974). "Unreasonably dangerous" means that "'[t]he article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.'" *Id.* at 1362–63 (quoting *Restatement (Second) of Torts* § 402A cmt. g). Finally, Plaintiff's expert testimony concerns only an alleged manufacturing defect, rather than a design defect or failure to warn claim. *See* Doc. 55-7, at 5.

sought "to determine if any mechanical aspect of Mr. Thompson's 2014 Super Glide motorcycle caused, or contributed to cause, the single vehicle motorcycle accident" at issue. Pl.'s Expert Report, Doc. 55-6, at 4. Mr. Ezra inspected the Motorcycle three times and the accident site once. *Id*. Asserting that his inspections were limited by crash damage, Mr. Ezra nevertheless performed what he describes as a "differential diagnosis"[9] on the Motorcycle to determine the cause of the accident. *See id*. at 7; Ezra Dep., Doc. 55-7, at 10–11. Relying on his inspections, among other items,[10] Mr. Ezra concluded that Mr. Thompson's Motorcycle "suffered a wobble mode instability"[11] resulting from the "steering head bearing adjustment [of the Motorcycle] being incorrect (too loose)." Doc. 55-6, at 10–11. This wobble, in Mr. Ezra's opinion, was "the most probable cause of the loss of control of the motorcycle by Mr. Thompson." *Id*. at 12.

Defendant now moves to exclude Mr. Ezra and, in turn, for summary judgment. *See* Docs. 55–56. The Court considers both motions in this Order.

---

[9] *See* discussion *infra* Section I, B.1 ("Methodology: Differential Diagnosis").

[10] In making his report, Mr. Ezra attests that he relied on the following items: (1) Defendants' written discovery; (2) Defendants' Rule 26 Disclosures; (3) "The [O]scillations of a Flexible Castor and the Effect of Front Fork Flexibility on the Stability of Motorcycles; SAE publication 780307"; (4) "Arkansas Uniform Motor Vehicle Collision Report . . . dated 09/27/2014"; (5) Mr. Thompson's deposition; (6) a receipt for an after-market windshield ordered and installed by Mr. Thompson; and (7) "[a] copy of the 'Dyna Models 2014 Harley-Davidson Service Manual.'" *See* Doc. 55-6, at 3; *see also* Doc. 55-2, at 4.

[11] As "wobble" is an engineering term, some background is in order. According to the Motorcycle Safety Foundation, a "wobble" is "a rapid, strong shaking of [a motorcycle's] handlebars" or "a rapid oscillation of the front wheel and steering components." Doc. 59-10, at 4–5. The parties' experts seem to generally agree on this definition. According to Defendant's expert, Dr. James Brendelson, "[w]obble mode consists of steer oscillations of the front assembly" analogous to "a shopping cart wheel that 'shimmies.'" *See* Def.'s Expert Report, Doc. 59-3, at 3. Mr. Ezra defines "steering assembly oscillations" as "Wobble Mode Instability." *See* Doc. 55-6, at 9.

## DISCUSSION

### I. *Motion to Exclude Plaintiff's Expert, Mark Ezra*

A. <u>Legal Standards</u>

District courts are the gatekeepers regarding admissibility of expert evidence. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2005). Guided by Federal Rule of Evidence 702, as explicated in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)[12] and its progeny, the Court enjoys "wide discretion" in performing its gatekeeping role. *Id.* at 1232–33; *see also Goebel v. Denver and Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000) ("*Goebel I*") ("The gatekeeper inquiry under Rule 702 is ultimately a flexible determination." (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)). However, while the Court "need not recite the *Daubert* standard as though it were some magical incantation," it "must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper." *Goebel I*, 215 F.3d at 1088 (internal quotation marks and citation omitted).

Rule 702, which governs the admission of expert testimony, states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

---

[12] "Faced with a proffer of expert scientific testimony. . . the trial judge must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93.

Fed. R. Evid. 702. Rule 702 requires the Court "to ascertain whether the proffered expert testimony is 'not only relevant, but reliable.'" *Graves v. Mazda Motor Corp.*, 675 F. Supp. 2d 1082, 1091 (W.D. Okla. 2009) (quoting *Daubert*, 509 U.S. at 589). This entails a two-step inquiry. First, the Court determines if the expert is qualified to give his opinion based on his "knowledge, skill, experience, training, or education." *See* Fed. R. Evid. 702; *Graves*, 675 F. Supp. 2d at 1092 (citing *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001)). Second, "if the expert is sufficiently qualified, the court must determine whether the expert's opinion is reliable." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (*en banc*). Sufficiently qualified experts may testify "if (i) the testimony is based upon sufficient facts or data, (ii) the testimony is the product of reliable principles and methods, and (iii) the witness has applied the principles and methods reliably to the facts of the case." *Graves*, 675 F. Supp. 2d at 1093. A proponent of expert testimony—here, the Plaintiff—must establish admissibility by a preponderance of the evidence. *Id*. at 1091 (citing Fed. R. Evid. 104(a)). As Defendant concedes that Mr. Ezra is qualified for the purposes of its motion, *see* Doc. 55, at 11, the Court assesses only the reliability and relevance of Mr. Ezra's proffered testimony.

"The reliability standard is 'lower than the merits standard of correctness,'" and plaintiffs need only show the Court that their experts' opinions are reliable, not that they are substantively correct. *Graves*, 675 F. Supp. 2d at 1093–94 (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)). To determine reliability, courts "assess the reasoning and methodology underlying the expert's opinion[] and determine whether it is scientifically valid and applicable to a particular set of facts." *Id*. at 1090 (citing *Goebel*

*I*, 215 F.3d at 1087); *see also Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."). *Daubert* suggests non-exhaustive factors to aid in this determination:

> (1) whether the opinion has been subjected to testing or is susceptible of such testing; (2) whether the opinion has been subjected to publication and peer review; (3) whether the methodology used has standards controlling its use and known rate of error; [and] (4) whether the theory has been accepted in the scientific community.

*Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1210 (10th Cir. 2004) (citing *Daubert*, 509 U.S. at 590).[13]

The reliability inquiry, however, is fact- and case-specific: no one factor is dispositive or always applicable, and the goal remains "ensuring that an expert 'employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Bitler*, 400 F.3d at 1233 (quoting *Kumho Tire*, 526 U.S. at 152); *see Daubert*, 509 U.S. at 590 ("Proposed testimony must be supported by appropriate validation—*i.e.,* 'good grounds,' based on what is known."); *United States v. Medina-Copete*, 757 F.3d 1092, 1103 (10th Cir. 2014) ("[T]he Rule 702 inquiry [is] a flexible one.

---

[13] The Advisory Committee Notes to Rule 702 offer additional factors that courts have found helpful in assessing reliability:

> (1) Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying; (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) Whether the expert has adequately accounted for obvious alternative explanations; (4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; (5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

*See* Fed. R. Evid. 702, advisory committee notes to 2000 Amendments (internal quotation marks and citations omitted).

*Daubert* makes clear that the factors it mentions do not constitute a definitive checklist or test. And *Daubert* adds that the gatekeeping inquiry must be tied to the facts of a particular case." (alteration in original) (quoting *Kumho Tire*, 526 U.S. at 150)).[14]

The Court also must inquire into whether the proffered expert testimony "is sufficiently 'relevant to the task at hand.'" *Bitler*, 400 F.3d at 1234 (quoting *Daubert*, 509 U.S. at 597). Relevance, or "fit," "look[s] at the logical relationship between the evidence proffered and the material issue that evidence is supposed to support to determine if it . . . aid[s] the trier of fact." *Id.*; *see also* Fed. R. Evid. 401 ("Evidence is relevant if . . . it has any tendency to make a fact [of consequence] more or less probable than it would be without the evidence."). Expert evidence with no bearing on an issue at hand may be inadmissible, even if methodologically sound. *See Bitler*, 400 F.3d at 1234 ("[I]t is the specific relation between an expert's method, the proffered conclusions, and the particular factual circumstances of the dispute, and not asymptotic perfection, that renders testimony both reliable and relevant.").

### B. Applying the Standards to Mr. Ezra's Proffered Testimony

Defendant attacks Mr. Ezra's opinions on multiple grounds, broadly arguing that they are unreliable and, thus, irrelevant. *See, e.g.*, Doc. 55, at 11. Many of these arguments

---

[14] Indeed, because Mr. Ezra proposes a type of methodology with which district and circuit courts have already grappled, *see* discussion *infra* Section I, B.1 ("Methodology: Differential Diagnosis"), the Court draws upon this applicable caselaw more than the "*Daubert* factors" *in this particular case and on these particular facts*. Were Mr. Ezra to propose a different theory or methodology, *e.g.* argue that there is a design defect with this line of motorcycles, the factors would perhaps be more helpful. *See Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813 (7th Cir. 2010) (reviewing district court's factor-intensive *Daubert* analysis of Mr. Ezra's proposed wobble decay theory in a design defect case); *Gonzales v. Harley-Davidson Motor Co. Grp., Inc.*, No. CV-04-0023-PHX-NVW (D. Ariz. July 26, 2005) (similarly analyzing Mr. Ezra's weave theory in a design defect case through an application of the *Daubert* factors).

go to the weight of Mr. Ezra's testimony—a question for the trier of fact—rather than its admissibility.[15] But two, overarching critiques fall within the Court's *Daubert* analysis: (1) Mr. Ezra's methodology is flawed and (2) Mr. Ezra simply applied no methodology and relied exclusively on experience, subjective opinions, and say-so.[16]

### 1. Methodology: Differential Diagnosis

Mr. Ezra purports to apply a differential diagnosis to the facts he relies on to reach his conclusions. In the medical context, "[d]ifferential diagnosis[] is the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings." *Bitler*, 400 F.3d at 1237 (internal quotation marks and citation omitted). Outside medicine, the Tenth Circuit refers to this methodology as "reasoning to the best inference," wherein the expert draws "'abductive inferences' . . . about a particular proposition or event by a process of eliminating all other possible conclusions to arrive at the most likely one, the one that best explains the available data." *Id*. at 1237, 1237 n. 5.

---

[15] For example, Defendant generally attacks the source material founding Mr. Ezra's conclusions, along with the conclusions themselves. As attacks on his methodology, these criticisms merit Court review. But as attacks on Mr. Ezra's conclusions or their foundations, these criticisms belong in cross-examination. *See Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929–30 (8th Cir. 2001) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." (internal quotation marks and citation omitted)).

[16] *See Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987) ("[The expert's] testimony is no more than [plaintiff's] testimony dressed up and sanctified as the opinion of an expert. Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible."); *see also Daubert v. Merrill Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("*Daubert II*") ("[P]laintiffs rely entirely on the experts' unadorned assertions that the methodology they employed comports with standard scientific procedures. . . . We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough.").

Reasoning to the best inference, or differential analysis generally, is a two-part analysis. First, the expert must establish general causation through "independent evidence that the cause identified is of the type that could have been the cause." *Id*. at 1237. Second, he must show specific causation by "eliminat[ing] other possible sources as highly improbable[] and . . . demonstrat[ing] that the cause identified is highly probable." *Id*. at 1238; *see also Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 881 (10th Cir. 2005) ("General causation is whether a substance is capable of causing a particular injury or condition in the general population and specific causation is whether a substance caused a particular individual's injury."). "Experts must provide objective reasons for eliminating alternative causes when employing a 'differential analysis.'" *Bitler*, 400 F.3d at 1237; *see also Hall v. ConocoPhillips*, 248 F. Supp. 3d 1177, 1190 (W.D. Okla. 2017), *aff'd sub nom*. *Hall v. Conoco, Inc.*, 886 F.3d 1308 (10th Cir. 2018) ("While a court 'can admit a differential diagnosis that it concludes is reliable if general causation has been established,' the expert must adequately consider and rule out alternative explanations." (quoting *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 999 (10th Cir. 2003) ("*Goebel II*")). But an expert need not "categorically exclude each and every possible alternative cause" to make such differential-based evidence admissible. *See Bitler*, 400 F.3d at 1238 n. 6 (internal quotation marks and citation omitted); *see also Taber v. Allied Waste Sys., Inc.*, 642 F. App'x 801, 811 (10th Cir. 2016) ("[T]he expert need only exclude those alternative explanations that are 'obvious'—*i.e.* where there is 'an established connection between certain possible causes and [the injury].'" (alteration in original) (quoting *Bitler*, 400 F.3d at 1238 n.6)). Rather, "the underlying premise of differential diagnosis is that there is an

established connection between certain possible causes and a condition . . . then all of the established causes are ruled out but one." *Bitler*, 400 F.3d at 1238 n.6 (internal quotation marks and citation omitted); *see also Taber*, 642 F. App'x at 811 ("So long as the most obvious causes have been considered and ruled out, the existence of possible 'uneliminated' causes goes to 'the accuracy of the conclusions, not the soundness of the methodology,' and therefore goes to the weight rather than admissibility of the evidence." (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 140 (D.C. Cir. 1996)).

*Bitler*'s facts are instructive. In *Bitler* plaintiffs suffered injuries from a gas explosion in their basement. *See Bitler*, 400 F.3d at 1230. Plaintiffs' experts—Elden Boh, a fire investigator, and Donald Sommer, an engineer—concluded that the Bitlers' water heater had exploded due to a gas leak caused by contamination on the heater's safety valve seat. *Id*. at 1230–31. On appeal, defendants challenged the district court's finding that plaintiffs' experts were admissible under *Daubert*. *Id*. at 1231–32, 1234. The Tenth Circuit dispensed with Mr. Boh's testimony quickly: the district court had not abused its discretion in admitting his testimony because Boh "observed the physical evidence at the scene of the accident and deduced the likely cause of the explosion." *Id*. at 1235. "Boh's personal experience, training, method of observation, and deductive reasoning [were] sufficiently reliable to constitute 'scientifically valid' methodology." *Id*.

Mr. Sommer's testimony received a more in-depth examination by the appellate court—of note here, as Sommer reached his conclusions through differential analysis.[17]

---

[17] "Sommer testified that he undertook a process of eliminating alternative possible causes, determining that these possibilities were improbable sources of the explosion, and arriving at a highly probable cause

Sommer concluded that "copper sulfide particles passed through and around [a] mesh screen to lodge on the safety valve seat and thereby cause the gas leak." *Id*. Sommer, "reason[ing] . . . backwards to the cause of [the] explosion," eliminated other potential causes, such as gas leaks in the Bitlers' bedroom and from a connector above the water heater, by assessing factors like the explosion's force and location. *See id*. at 1237–38.[18] This analysis was also predicated on an uncontroverted fact: "if copper sulfide particles of sufficient size became lodged on the safety valve seat, then a gas leak substantial enough to cause the explosion [at issue] could occur." *Id*. at 1238.[19] Thus, "admitting expert testimony . . . employ[ing] an expert's physical investigation, professional experience, and technical knowledge to establish causation" was not an abuse of the district court's discretion. *Id*.

The Court finds Mr. Ezra's differential analysis in this case analogous to those in *Bitler*. In his deposition, Mr. Ezra described his methodology as follows:

> What I am looking at . . . in performing what is effectively a differential diagnosis of the Thompson accident is **we have a reported event that I believe is an unstable response to a disturbance by Mr. Thompson's steering assembly** and I also know that in general the Dyna Super Glide motorcycle does not exhibit this kind of response, **and therefore differentially I then eliminate other areas that would be likely . . . to produce this response**. So as you questioned me earlier I considered the

---

for the gas leak, calling it a method of 'differential diagnosis.'" *Bitler*, 400 F.3d at 1237. The Court characterizes both plaintiffs' experts as using a "reasoning to the best inference" methodology. *Id*.

[18] "Sommer and Boh both testified to how they eliminated the gas leaks in the bedroom and the T-connector above the water heater as likely sources of the accident; the one was not located close enough to the source of the explosion, and the other was itself most likely the result of trauma caused by the explosion. Sommer testified that the force of the explosion lifted the house off its foundation, and accordingly, was the most probable cause of the leak at the T-connector, especially in light of its damaged physical condition." *Id*. at 1237.

[19] The appellate court also noted that, "because the reliability of the science of copper sulfide contamination [was] not in dispute," the need to test the experts' methodologies and conclusions was "not at its highest." *Id*. at 1236.

wheel bearing adjustment and the wheel bearing adjustment in my opinion in spite of the crash . . . w[as] adequately adjusted. . . . [W]e did not disassemble the forks and measure the oil in the forks, but . . . there was no sign of leakage on the front forks so I presume that they were filled sufficiently accurately, that any differences between the right and left fork oil amounts were not going to cause differential action of the front forks. The front fender which acts as a bridge between the left and right fork sliders was tight and appears . . . not [to] have loosened and so that was adequate. **All these things are areas that can affect the response of the castor to a disturbance** and I was able to eliminate the front wheel being misconstrued. . . . **I proceeded through the whole assembly and the net result of all of that is that the item that will have the . . . most significant primary effect on overall lateral stiffness of the steering assembly of the Thompson Dyna Glide is the steering bearing adjustment . . . and I believe that is . . . what caused this motorcycle . . . to act differently than . . . its siblings**.

Doc. 55-7, at 10–11 (emphasis added).[20] As this Court understands it, Mr. Ezra, in order to conclude that the steering bearing adjustment ultimately caused the accident at issue, (1) reviewed materials, such as Mr. Thompson's account and eyewitness testimony; (2) deduced, based on these materials and his experience,[21] that the "shaking" described was a wobble; and (3) performed accident site and vehicle inspections to eliminate potential causes of the wobble until he reached what, in his eyes, was the likely culprit. *See generally* Doc. 55-6, 55-7. While, in an ideal situation, Mr. Ezra might have performed additional

---

[20] Mr. Ezra describes his differential analysis at length several times throughout the deposition. *See* Doc. 55-7, at 12, 13, 15–16.

[21] As stated, Defendants do not contest Mr. Ezra's qualifications. As a function of experience, though, it is worth noting that Mr. Ezra holds degrees or diplomas in Mechanical Engineering and "Technology: Theory and Practice of Automatic Control," has driven motorcycles over 250,000 miles, and has worked in the automotive industry as an engineer or technician since the mid-1970s. *See* Mark A.M. Ezra, P.E. Curriculum Vitae, Doc. 59-15.

testing[22] and referenced more scholarly support beyond one scientific paper,[23] these

"alleged shortcomings of [his] proffered testimony . . . go to the 'weight which the trier of

---

[22] For instance, Defendants fault Mr. Ezra for failing to perform a "fall away test," which the Harley-Davidson Service Manual recommends for checking that "the steering head bearings are correctly adjusted." *See* Doc. 55, at 7; Doc. 55-6, at 7. First, discrepancies between Mr. Ezra's report and deposition make it unclear as to whether he performed the fall away test. *Compare* Doc. 55-6, at 7 (appearing to find steering stem behavior "abnormal and asymmetric" through the fall away test) *with* Doc. 55-7, at 6 (stating that damage precluded him from performing a fall away test). Notably, similar discrepancies appear with Defendants' expert, Dr. Brendelson, who—like Mr. Ezra—asserts in his report that the fall away measurement was precluded by the Motorcycle's damage. *Compare* Def.'s Expert Report, Doc. 59-3, at 6 ("Due to crash damage, the fallaway measurement could not be properly performed as recommended in service.") *with* Brendelson Dep., Doc. 59-6, at 10 (opining that steering bearings were "properly seated . . . based on the fall-away measurement that we did"); *see also* Doc. 55-7, at 4 ("I would have liked to have verified the steering bearing adjustment . . . . but unfortunately the damage to the motorcycle was such that I couldn't. Mr. Brendelson came to the same conclusion."). But Defendant mischaracterize Mr. Ezra's methodology: while he did not perform the fall away test, he adapted his differential analysis to account for this—and, moreover, confirmed that damage to the Motorcycle rendered the fall away test useless through additional inspection. *See* Doc. 55-6, at 7–8; Doc. 55-7, at 6. More to the point, Mr. Ezra's differential analysis, even if falling short of a "model" analysis, may still be admissible under *Daubert* so long as it is reliable and relevant.

[23] The Court must discuss this "Roe" paper, as the parties refer to it. *See* Doc. 55-6, at 16–27. The paper is titled, "The Oscillations of a Flexible Castor, and the Effect of Front Fork Flexibility on the Stability of Motorcycles," by G.E. Roe. *See id.* As far as "scientific sources" go, this is the only one cited by Mr. Ezra. *See* Doc. 55-7, at 10–11. Mr. Ezra asserts that "it 'show[s] . . . the relationships leading to why a free castor will respond in an unstable manner and also takes into account the effect . . . of steering bearing adjustment." *See id.* at 10–13; *see also* Doc. 55-6, at 9 ("The reader is referred to Exhibit A [the Roe paper] attached to this report, in order to understand the sources of adjustments and design features of motorcycles, which may lead to sustained oscillations of the steering head bearing adjustment and stiffness is a significant factor in the wobble mode instability of . . . the steering assembly of most motorcycles."). Partly relying on this paper, Mr. Ezra opines that a loose steering head bearing assembly will reduce damping, or the rate at which oscillations of the steering assembly die out. *See* Doc. 55-7, at 12, 17. Defendants argue that the Roe paper does not support this opinion, as the paper fails to explicitly discuss "steering head preload or damping." *See* Doc. 55, at 7–8. Thus, in Defendant's eyes, Mr. Ezra offers inadmissible *ipse dixit* testimony.

The Court is not so convinced. The Roe paper, on its first page, notes that "[c]hanges in wobble characteristics have been observed with variation of wheel layout geometry, inertia distribution, wheel loading, road surface condition, and most important of all with lateral stiffness of the wheel mounting." Doc. 55-6, at 16. For defendants, the absence of "steering head bearing preload" or "damping" in this list is damning. But the paper, a few lines down, observes that "it is very clear that the most important parameter affecting stability is lateral stiffness," the paper's overall conclusion. *Id.* Mr. Ezra testified in his deposition that steering head bearings are part of a steering system and contribute to that system's lateral stiffness; this stiffness, in turn, contributes to the damping of potential "wobble." *See* Doc. 55-7, at 11–13. Moreover, the Roe paper is not the only source for Mr. Ezra's conclusions about the relationship between steering head bearings and wobble. He notes that the Motorcycle's service manual instructs riders experiencing wobble to check the steering head bearing adjustment. *See id.* at 17. Thus, this Court finds that Mr. Ezra's synthesis of the generalities in the Roe paper with his own engineering experience, along with the additional materials he reviewed in preparing his expert report, satisfy *Daubert*'s reliability threshold.

fact should accord the evidence and do not make the testimony incredible.'" *Bitler*, 400

F.3d at 1236 n. 2 (quoting *Orth v. Emerson Elec. Co.*, 980 F.2d 632, 637 (10th Cir. 1992)).

Defendants analogize Mr. Ezra to the expert in *Heer v. Costco Wholesale Corp.*,

589 F. App'x 854 (10th Cir. 2014), but the Court finds the analogy inapposite. The plaintiff

in *Heer* was injured falling off a step stool purchased at Costco; the stool's front left leg

was bent inward when inspected after the fall. *Heer*, 589 F. App'x at 856–57. Plaintiff's

expert, Mr. Stolz, measured the stool in a laboratory and reviewed plaintiff's deposition

testimony, concluding from these sources that plaintiff's injury stemmed from a defect in

the stool's leg. *Id*. at 857. The district court excluded Stoltz's testimony as insufficiently

reliable, and plaintiff appealed. *Id*. at 857–59. The Tenth Circuit affirmed, noting that "Mr.

Stoltz's opinion as to causation [was] unsupported by anything other than speculation." *Id*.

at 862.

That is not the case here. Defendant may disagree with Mr. Ezra's conclusions, but

the correctness of those conclusions is a question for the jury. *See Bitler*, 400 F.3d at 1236

("The core dispute . . . is one the district court could properly determine is a question for

the jury."); *Graves*, 675 F. Supp. 2d at 1093 ("[T]he trial court's determination of

'reliability' . . . is not a determination as to whether the expert's proposed testimony is

substantively correct."). Unlike the *Heer* expert, Mr. Ezra did apply a methodology and did

conduct testing before reaching his opinions. Moreover, as to the methodology itself, Mr.

Ezra cites objective rationales for (1) his opinion that wobble, in the abstract, can cause

this type of accident and (2) his elimination of other alternative causes.[24] Defendants are quick to note that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). But this Court does not find "too great an analytical gap between the data and the opinion [Mr. Ezra] proffer[s]" so as to compromise his testimony's reliability. *See id.* Thus, Mr. Ezra's purported methodology is reliable under *Daubert*.

### 2. *Methodology: Mr. Ezra's Reliance on His Experience*

Defendants alternatively assert that Mr. Ezra deploys no methodology at all to reach his ultimate conclusions, instead simply relying on his "experience" and a series of unfounded assumptions. *See generally* Doc. 55. Rule 702 does not preclude experience,

---

[24] For example, Defendants' expert, Dr. Brendelson, concludes that the accident resulted from rider error—Mr. Thompson crossed over difficult-to-see rumble strips embedded in the edge of the roadway, became distracted, and had insufficient time to fully diagnose the problem before hitting the concrete bridge abutment. Doc. 59-3, at 7–9. Mr. Ezra finds this implausible based on Dr. Brendelson's frequency calculations from running over the rumble strips at 40 miles per hour. *See* Doc. 55-7, at 17, 19. Mr. Hubbard's testimony, on which Mr. Ezra relies, also states that Mr. Thompson was driving near the center of the road—away from the rumble strips—when the shaking began. *See* Doc. 59-4, at 2. Dr. Brendelson, in turn, finds Mr. Ezra's wobble hypothesis implausible because, as he forthrightly asserts, wobble cannot occur with a rider's hands on the handlebars. *See* Doc. 59-3, at 3 ("Wobble mode occurs . . . [with] hands off the handlebars. When the hands are then placed on the handlebars, the wobble damps out very quickly and is no longer perceptible to the rider."); *see also id.* at 8 ("Mr. Thompson did not experience a wobble event because Mr. Thompson testified that his hands were on the handlebars during the duration of the event."); Doc. 59-6, at 2, 4. Mr. Ezra impliedly addresses this argument through his discussion of the reduced damping stemming from a less-stiff steering assembly, which he opines is caused by a loose steering head bearing. *See generally* Doc. 55-7. He also notes that the Motorcycle's service manual discusses wobble without referencing the position of the rider's hands. *See id.* at 17. The jury should weigh this back-and-forth. But in juxtaposing the experts' conclusions and arguments, outlined in their depositions and reports, one sees that their *methodologies* are quite similar. *Compare* Doc. 59-3 *with* Doc. 55-6. The Tenth Circuit has found it within district courts' discretion to examine competing experts' methodologies as part of a *Daubert* reliability analysis, so long as courts avoid judging the credibility or plausibility of a particular expert's conclusions. *See Heer*, 589 F. App'x at 862–63. As applied here, assessing the methodologies of Dr. Brendelson and Mr. Ezra alongside one another reveals that many of Defendant's arguments attack Mr. Ezra's ultimate conclusions, rather than how he reached them.

"or experience in conjunction with other knowledge, skill, training or education," from providing a "sufficient foundation for expert testimony," as experience may be the "predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702, advisory committee notes to 2000 Amendments. "Where an expert testifies based on experience," however, the court "reviews the reliability of the testimony with reference to the nature of the issue, the expert's particular expertise, and the subject of the testimony." *F & H Coatings, LLC v. Acosta*, 900 F.3d 1214, 1222 (10th Cir. 2018) (internal quotation marks, alterations, and citation omitted). Experience, standing alone, is not a methodology; rather, "[m]ethodology is the process by which the expert relates his experience to the facts at hand in order to reach an expert opinion." *Dean v. Thermwood Corp*., No. 10-cv-433-CVE-PJC, 2012 WL 90442, at *7 (N.D. Okla. Jan. 11, 2012)

*Dean v. Thermwood Corp.* offers an example of inadmissible expert testimony based solely on experience—and helps to show why Mr. Ezra's testimony is, conversely, admissible. The plaintiff in *Dean* suffered injuries from a router machine he was using. *Id*. at *1. Alleging a manufacturing defect, plaintiff turned to Bradley Briscoe as an expert witness, who opined that the machine was defective because it ran even after an emergency stop button was pressed. *Id*. But Briscoe based his opinion solely on plaintiff's testimony that he had pressed this button; Briscoe neither "physically examine[d] the machine" nor "tr[ied] to duplicate the sequence of events" leading to the accident. *Id*. at *4. In Briscoe's words, his "methodology consist[ed] solely of his years of experience using [similar] machines." *Id*. at *6. The court excluded Briscoe's proffered testimony, reasoning that experience alone does not meet *Daubert*'s reliability threshold. *Id*. at *6–7. The court was

similarly unconvinced that Briscoe had performed a differential analysis, since "Briscoe did not eliminate *any* possible cause of the accident" and "simply gave full credence to [p]laintiff's recitation of events," concluding that "under those circumstances the only possible explanation for the accident was a product defect." *Id*. at *7–9 (emphasis in original).

To be sure, the Court finds some merit in Defendant's arguments regarding Mr. Ezra's use of his experience. At several turns Mr. Ezra cites the assumptions or "self-evident truths" he relies upon to move from one step in his analysis to the next. *See generally* Doc. 55-6, 55-7. But while a cursory review of Mr. Ezra's expert report and deposition may give one the impression that Mr. Ezra drew some of his conclusions out of thin air, a more exhaustive and thorough reading reveals an analytical through-line supported by an acceptable methodology applied reliably. The Court views Mr. Ezra's frequent citations to his years of experience and assumptions as an explanation of his differential analysis and how he applies it—even if a less-than-ideally-clear explanation.[25] Nonetheless, Mr. Ezra is free to rely on his experience in his analysis, so long as it forms a facet of and relates to the facts at issue through his larger methodology. The Court finds this to be the case.

* * * * * * * * * *

---

[25] In other words, that Mr. Ezra's deposition testimony (and, similarly, Plaintiff's briefing) is sometimes unclear should not distract from what is, at bottom, an accepted methodology deployed reliably by Mr. Ezra. Likewise, Mr. Ezra's frequent references to his experience are better characterized as references to a *feature* of his overall analysis rather than evidence of *ipse dixit* testimony.

Mr. Ezra considered a fixed galaxy of potential causes, ruled out all but one based on objective criteria such as physical inspections, and arrived at a conclusion. In doing so he looked to his engineering experience and what testing he could perform—all within the context of a recognized and accepted differential methodology. Under *Daubert*'s reliability standard, this is enough. Moreover, the Court finds Mr. Ezra's reliable proffered testimony relevant. Under either theory of liability pled in this suit, Plaintiff must prove that Defendant caused his injuries. Mr. Ezra's testimony bears directly on causation and, thus, meets *Daubert*'s relevance standard as well.

Defendant may well convince a jury that Mr. Ezra's conclusions are incorrect, or that his testimony is less convincing than the testimony of Defendant's expert. But "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking . . . admissible evidence," even if such evidence may be "shaky." *Daubert*, 509 U.S. at 596. And this Court recognizes that "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702, advisory committee notes to 2000 Amendments. As stated, Defendant will have the opportunity to present its arguments to the appropriate body—the jury. While this Court has discretion in performing its *Daubert* analysis, its "role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore Cty., Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996).

For the reasons stated above, this Court DENIES Defendant's Motion to Exclude Plaintiff's Expert, Mark Ezra.

## II. *Motion for Summary Judgment*

Plaintiff is correct in asserting that Defendant's Motion for Summary Judgment is "largely a restatement" of Defendant's Motion to Exclude Plaintiff's Expert. *See* Doc. 60, at 7. Indeed, Defendant offers no arguments for why summary judgment would be warranted should the Court deny its Motion to Exclude, as it has done. *See* Doc. 56. In other words, Defendant's request for summary judgment hinges entirely on its Motion to Exclude and the arguments contained therein. In light of the Court's analysis above, consideration of Defendant's Motion for Summary Judgment will, accordingly, be brief.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. . . . An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Id*. at 670–71 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If the movant carries this initial burden, the nonmovant that would bear the burden of persuasion at trial may not simply rest upon its pleadings; the burden shifts to the nonmovant to go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id*. at 671 (citing Fed. R. Civ. P. 56(e)).

In short, the Court must inquire "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52. While the Court construes all facts and reasonable inferences in the light most favorable to the non-moving party, *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 712–13 (10th Cir. 2014), "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252. At the summary judgment stage, the Court's role is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

As the Court has denied Defendant's Motion to Exclude Plaintiff's Expert, Mark Ezra—and finding no additional arguments in favor of summary judgment—Defendant has failed to carry its initial burden under Rule 56. Applying Oklahoma negligence and manufacturers' products liability law to this dispute, *see supra* note 8, and considering the evidence presented, the Court finds numerous genuine disputes as to material facts. Accordingly, this Court DENIES Defendant's Motion for Summary Judgment.

## CONCLUSION

Plaintiff proffers relevant and reliable expert testimony under *Daubert*. Considering the proffered expert testimony, summary judgment is inappropriate, as there are genuine disputes as to material facts. Accordingly, Defendant's Motions, Docs. 55–56, are DENIED.

IT IS SO ORDERED this 25th day of September 2018.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE